# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

DESTINY Y. TROUT,            :
                            :
        Plaintiff           :
                            :    No. 3:11-CV-1572
    vs.                     :
                            :    (Judge Nealon)
MICHAEL J. ASTRUE,          :
COMMISSIONER OF SOCIAL      :
SECURITY,                   :
                            :
        Defendant           :

FILED
SCRANTON

JAN 1 0 2013

PER _____
        DEPUTY CLERK

## MEMORANDUM

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Destiny Y. Trout's claim for social security disability insurance benefits.

Trout protectively filed her application for disability insurance benefits on December 18, 2008. Tr. 14, 65 and 136-140.[1] The application was initially denied by the Bureau of Disability Determination[2] on June 26, 2009. Tr. 14 and 67-71. On July 17, 2009, Trout requested a hearing before an administrative law judge. Tr. 72-73. On August 12, 2010, a hearing was held before an administrative law judge. Tr. 27-64. On November 8, 2010, the administrative law judge issued a decision denying Trout's

---

1. References to "Tr.___" are to pages of the administrative record (Doc. 8) filed by the Defendant on January 19, 2012.

2. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 68.

application. Tr. 14-26. On December 16, 2010, Trout filed a request for review with the Appeals Council and on June 30, 2011, the Appeals Council concluded that there was no basis to grant Trout's request for review. Tr. 1-5 and 8-10.

Trout then filed a complaint in this court on August 23, 2011. Supporting and opposing briefs were submitted and the appeal[3] became ripe for disposition on March 8, 2012, when Trout filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Trout met the insured status requirements of the Social Security Act through June 30, 2010. Tr. 14, 16, 141 and 148. In order to establish entitlement to disability insurance benefits, Trout was required to establish that on or before June 30, 2010, she suffered from a disability which had lasted for a continuous period of 12 months or was expected to last for a continuous period of 12 months. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

---

3. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

Trout, who was born in the United States on November 11, 1975, graduated from high school and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 151, 162 and 181. During her elementary and secondary schooling, Trout attended regular education classes. Id. After high school, Trout attended college for two years and obtained an associate degree in art. Tr. 31 and 162.

Trout worked as a customer service representative, secretary/receptionist and salesperson. Tr. 164-176. Trout's work history covers the years 1992 through 2005. Tr. 142. Trout's total earnings during those years were $163,851.28. Id. Her annual earnings ranged from a low of $1116.87 in 1993 to a high of $25,713.63 in 2001. Id.

According to the vocational expert who testified at the administrative hearing, Trout's past relevant employment[4] was as a customer service representative. Tr. 56-59. That position was

---

4. Past relevant employment in the present case means work performed by Trout during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

described as semi-skilled, sedentary to light work.[5] Id. Trout
has not worked since December 15, 2005. Tr. 153.

Trout claims that she became disabled on July 30, 2006,
because of both physical and mental impairments. However, in the
present appeal she primarily focuses on her mental impairments.

---

5. The terms sedentary, light and medium work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools. Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties. Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work*. Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls. To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work*. Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds. If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.

20 C.F.R. § 404.1567.

Tr. 16, 30, 67 and 152; Doc. 11, Plaintiff's Brief, p.2. Trout alleges that she suffers from bipolar disorder, generalized anxiety disorder, panic attacks with agoraphobia,[6] explosive temper, posttraumatic stress disorder and personality disorders. Id.

For the reasons set forth below, the Court will remand the case to the Commissioner for further proceedings.

## Standard of Review

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

---

6. According to the National Institute of Health's website

> Panic disorder with agoraphobia is an anxiety disorder in which there are repeated attacks of intense fear and anxiety, and a fear of being in places where escape might be difficult, or where help might not be available in case of a panic attack. . . .

Panic disorder with agoraphobia, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.nlm. nih.gov/medlineplus/ency/article/000923.htm (Last accessed January 7, 2013).

1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11
(11th Cir. 1990).

    Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d
Cir. 1999). Substantial evidence has been described as more than
a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213. In an adequately developed factual
record, substantial evidence may be "something less than the
weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

7

period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work. For
> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in

evaluating disability insurance and supplemental security income

claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This

process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful

activity,[7] (2) has an impairment that is severe or a combination

of impairments that is severe,[8] (3) has an impairment or

---

7. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit." 20 C.F.R.
§ 404.1510.

8. The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no
(continued...)

combination of impairments that meets or equals the requirements of a listed impairment,[9] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social

---

8. (...continued)
impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

9. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

10. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS AND OTHER EVIDENCE**

Before the Court addresses the administrative law judge's decision and the arguments of counsel, some of Trout's medical records and other evidence of Trout's functional abilities will be reviewed. The Court will focus on medical treatment received by Trout for mental conditions after the alleged disability onset date of July 30, 2006.

On September 7, 2006, Trout was examined at the Juniata Valley Medical Group. Tr. 380-381. The objective portion of the report of this examination states in pertinent part as follows: "Psych: Patient's attitude is cooperative. Displays periods of depression and periods of sadness during encounter. Patient's affect is labile.[11] Speech is clear, fluent and rapid. Thought processes demonstrate coherence and logic. Intact recent and remote memory. Judgment is realistic. Insight is appropriate." Tr.

---

11. Labile is defined as fluctuating or unstable.

381. The medical professional's assessment was that Trout suffered from bipolar affective disorder, mixed unspecified, and Trout was prescribed the medication Zyprexa.[12]  Id.  Trout was again seen at Juniata Valley Medical Group on October 16, 2006.  Tr. 377-378. The report of that appointment reveals that Trout suffered side-effects from the medication Zyprexa.  Id.  Trout was diagnosed as suffering from depression; Zyprexa was discontinued; and Trout was prescribed the antidepressant drug Wellbutrin.  Id.

On January 8, 2007, Trout was evaluated by Jagadeesh K. Moola, M.D., a psychiatrist, located in Camp Hill, Pennsylvania. Tr. 395-397.  After conducting a clinical interview and mental status examination, Dr. Moola concluded that Trout suffered from bipolar disorder and could not rule out generalized anxiety disorder.  Tr. 396.  Dr. Moola assessed Trout with a Global Assessment of Functioning (GAF) score of 55.[13]  Tr. 397.  Trout

12. Zyprexa (olanzapine) "is an atypical antipsychotic medication . . . used to treat symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression) in adults and children who are at least 13 years old." Zyprexa, Drugs.com, http://www.drugs.com/zyprexa.html (Last accessed January 4, 2013).

13. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment
(continued...)

was prescribed the medications Lamictal[14] and Ativan.[15]  At an

appointment on April 9, 2007, Dr. Moola added the drug Lexapro[16]

to Trout's treatment regimen.  Tr. 398.  On May 1, 2007, after a

phone call with Trout, Dr. Moola increased Trout's dosage of

Lexapro. Tr. 398.  A medical notation dated June 28, 2007, reveals

---

13.  (...continued)
and predicting outcomes. Id.  The GAF rating is the single value
that best reflects the individual's overall functioning at the
time of examination.  The rating, however, has two components: (1)
symptom severity and (2) social and occupational functioning.  The
GAF is within a particular range if either the symptom severity or
the social and occupational level of functioning falls within that
range.  When the individual's symptom severity and functioning
level are discordant, the GAF rating reflects the worse of the
two.  Thus, a suicidal patient who is gainfully employed would
have a GAF rating below 20.  A GAF score of 21-30 represents
behavior considerably influenced by delusions or hallucinations or
serious impairment in communication or judgment or inability to
function in almost all areas.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major
impairment in several areas,  such as work or school, family
relations, judgment, thinking or mood. Id.  A GAF score of 41-50
indicates serious symptoms or any serious impairment in social,
occupational or school functioning.  Id.  A GAF score of 51 to 60
represents moderate symptoms or any moderate difficulty in social,
occupational, or school functioning. Id.

14.  Lamictal is an anti-epilectic medication but also "used to
delay mood episodes in adults with bipolar (manic depression)."
Lamictal, Drugs.com, http://www.drugs.com/lamictal.html (Last
accessed January 4, 2013).

15.  Ativan (lorazepam) is a benzodiazepine drug "used to treat
anxiety disorders." Ativan, Drugs.com, http://www.drugs.
com/ativan.html (Last accessed January 4, 2013).

16.  Lexapro (escitalopram) is a drug used to treat anxiety and
major depression. Lexapro, Drugs.com, http://www.drugs.com
/lexapro.html (Last accessed January 4, 2013).

that Dr. Moola continued prescribing Trout the drugs Ativan and Lexapro. Id.

Trout was examined at Juniata Valley Medical Group on July 9, 2007, for physical problems (lower back pain). Tr. 374-376. The record of this appointment reveals that Trout's current medications included Lexapro, Lamictal and Ativan. Tr. 375.

On August 7, 2007, Trout had a annual female examination at Juniata Valley Medical Group. Tr. 360-363. The record of this appointment reveals that Trout's current medications included Lamictal, Ativan and Lexapro. Id. At that appointment, Trout reported suffering from anxiety and depression and it was noted that Trout was seeing Dr. Moola every 3 months. Id.

On November 13, 2007, Trout was examined by Dr. Moola. Tr. 399. After observing Trout and conducting a mental status examination, Dr. Moola concluded that Trout suffered from bipolar disorder and generalized anxiety disorder. Id. The appointment notes indicate that Trout had an anxious affect. Id. Trout's prescriptions for Lamictal, Lexapro and Ativan were continued. Id.

On January 28, 2008, Trout had an appointment with Dr. Moola. Tr. 400. The report of this appointment reveals that Trout had an anxious mood and Dr. Moola prescribed Lamictal, Wellbutrin and Ativan. Id. At an appointment on February 25, 2008, Dr. Moola observed that Trout had restless motor behavior

13

and an anxious mood and continued Trout's current medications. Tr. 401.

On February 26, 2008, Trout had an appointment at Juniata Valley Medical Group for complaints of nausea, fatigue, lower abdomen cramping and flank pain. Tr. 357-359. Trout's current medications included Lamictal, Ativan and Wellbutrin. Id. The report of this appointment reveals that the Lexapro was discontinued and Wellbutrin added. Tr. 358.

Trout had an appointment with Dr. Moola on April 24, June 26, September 22, and October 20, 2008; January 13, April 6, May 19, July 7, August 20, September 21, and December 18, 2009; and March 2 and April 2, 2010. Tr. 402-414. The records of these appointments reveal that Dr. Moola routinely observed either an anxious or depressed affect and he continued to prescribe Trout medications for anxiety and depression. Id.

On January 19, 2009, Dr. Moola completed, on behalf of Trout, a document entitled "Pennsylvania Department of Public Welfare Health-Sustaining Medication Assessment Form." Tr. 294-295. In that document, Dr. Moola stated that Trout "has a physical or mental disability which permanently precludes any gainful employment[.]" Tr. 294 (emphasis in original). Dr. Moola further stated that Trout suffered from bipolar disorder and generalized anxiety disorder and that his assessment was based on

14

review of the medical records, a clinical history and mental status examinations.[17]  Id.

On April 6, 2009, Dr. Moola completed, on behalf of Trout, a document entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."  Tr. 257-259.  In that document, Dr. Moola stated that Trout had extreme limitations (defined as "no useful ability to function")[18] in her ability to make judgments on simple work-related decisions, respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting; and that Trout had marked limitations (defined as "the ability to function is severely limited but not precluded") in her ability to interact appropriately with the public, supervisors and coworkers. Tr. 258.  Dr. Moola noted that his mental status examination supported his assessment.  Tr. 259.

---

17.  As two commentators have explained: "It has been held that in the field of mental evaluation, the diagnoses and observations of trained professionals are the analog to clinical and laboratory data.  The Social Security Administration thus may not reject those reports simply because of the relative imprecision of the methodology or the absence of substantial documentation." Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 567 (2012)(footnotes omitted).

18.  The definitions were set forth in the body of the form completed by Dr. Moola.

On May 11, 2010, Dr. Moola completed, on behalf of Trout, a document entitled "Medical Statement Regarding the Nature and Severity of Mental Impairment(s)." Tr. 391-392. In that document, Dr. Moola stated that Trout had moderate limitations (defined as "has limitations often") in her ability to maintain attention/concentration, sustain an ordinary routine without special supervision, and maintain socially appropriate behavior; marked limitations (defined as "unable to function independently, appropriately, effectively, and on a sustained basis") in her ability to work with or near others without being distracted, make simple work-related decisions, complete a normal workday or workweek, interact appropriately with the public, and perform tasks/activities within a schedule; and extreme limitations (defined as "no useful ability") in her ability to deal with work stress, fulfill quota or production requirements, get along with co-workers and peers, accept instructions/respond appropriately to criticism, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Tr. 391.

Dr. Moola stated that Trout suffered from bipolar disorder and generalized anxiety disorder and that his assessment was based on the following "signs/findings": feelings of hopelessness, feelings of worthlessness, mood disturbance,

feelings of helplessness, concentration difficulty, psychomotor retardation, sleep pattern changes, tearfulness, attention difficulty, poor judgment, decreased energy, motor tension, agitation/irritability, anxiety, memory difficulty, frustration, low self-esteem and anhedonia. Tr. 392. Dr. Moola stated that Trout had a "residual disease process of at least 2 years duration that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." Id. Dr. Moola further noted that Trout's impairments had existed and persisted with these limitations since July 30, 2006, and that on average Trout's impairments would cause her to be absent from work more than 2 times per month. Id.

On July 23, 2010, Dr. Moola completed a similar statement which set forth several marked and extreme mental limitations. Tr. 393-394. The vocational expert who testified at the administrative hearing indicated that if Dr. Moola's assessments were accepted, Trout would not be able to engage in any gainful employment. Tr. 59-62.

On June 16, 2009, Trout was evaluated by Nicholas E. Brink, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 265-270. Like Dr. Moola, Dr. Brink diagnosed Trout as suffering from bipolar disorder. Id. However,

17

he also found that Trout suffered from panic attacks with agoraphobia, an explosive temper[19] and posttraumatic stress disorder. Tr. 268. Dr. Brink found that Trout had marked limitations in her ability to make judgments on simple work-related decisions and respond appropriately to work pressures in a usual work setting. Tr. 269. He further found that Trout had moderate limitations in her ability to carry out short, simple instructions, interact appropriately with the public, supervisors and co-workers, and respond appropriately to changes in a routine work setting. Id. The vocational expert who testified at the administrative hearing indicated that if Dr. Brink's assessment was accepted, Trout would not be able to engage in any competitive employment. Tr. 59-62.

On June 23, 2009, Michelle Santilli, Psy.D., a psychologist, reviewed Trout's medical records and completed a functional assessment form on behalf of the Bureau of Disability Determination. Tr. 275-291. Dr. Santilli only conducted a records review and did not examine Trout. Id.

The form completed by Dr. Santilli in Section I rated various mental functions (as not significantly limited, moderately limited, markedly limited, no evidence of limitation and not

19. According to the *Diagnostic and Statistical Manual of Mental Disorders* this would be categorized as an impulse-control disorder.

ratable on available evidence) and instructed the individual completing the form as follows: "Each mental activity is to be evaluated within the context of the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis. Detailed explanation of the degree of limitation for each category . . . as well as any other assessment information you deem appropriate, is to be recorded in Section III (Functional Capacity Assessment)." Id.

Dr. Santilli, on the form, found that Trout was moderately limited in the following areas: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal workweek without interruption from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness

19

and cleanliness and the ability to respond appropriately to changes in the work setting. Tr. 275-276.

Dr. Santilli concluded, based on a review of Trout's medical records, that Trout was not "markedly" limited with respect to any aspect of her mental functioning and in Section III stated that Trout was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments." Tr. 278. The form utilized by Dr. Santilli does not define the terms "moderately limited" or "markedly limited."[20]

---

20. With respect to that form, presently the Social Security Program Operation Manual System (POMS) defines "moderately limited" as "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired" without specifying the degree of impairment and the degree of limitations/impairment has to be specified in Section III of the form. As for "markedly limited" it is defined in the POMS as "when the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity." See POMS DI 24510.63, http://policy.ssa.gov/poms.nsf/lnx/0424510063 (Last accessed January 4, 2013). In the present case, the Court has no way of determining if these are the definitions that Dr. Santilli utilized. Furthermore, these definitions only became effective on October 14, 2010. Id. With respect to the POMS, the Social Security website sets forth the following disclaimer: "The POMS states only internal SSA guidance. It is not intended to, does not, and may not be relied upon to create any rights enforceable at law by any party in a civil or criminal action. Further, by posting the POMS, SSA is not thereby limited from exercising its otherwise lawful prerogatives. If the content of the POMS conflicts with the Social Security Act, another relevant statute, SSA regulations, or Social Security Rulings, those authorities have priority over the POMS." SSA's Program Operations Manual System Home, https://secure.ssa.gov/poms.nsf/home!readform (Last
(continued...)

The form completed by Dr. Brink in which he notes several marked and moderate limitations also does not define the terms "marked" or "moderate." The form was not the usual "Mental Residual Functional Capacity Assessment" utilized by state agency psychologists (Form SSA-4734-BK-Sup) and used in this case by Dr. Santilli. Although the POMS now appears to define the terms "markedly limited" and "moderately limited" (which definitions became effective on October 14, 2010, well-after Dr. Brink's and Dr. Santilli's assessments), the record in the present case does not indicate how Dr. Brink and Dr. Santilli defined those terms. The ramifications of the absence of definitions for these terms in the record will be elaborated on more fully below in the discussion section of this memorandum.

Trout, in a document filed with the Social Security Administration, stated as follows: "My unpredictable moods have lead to situations that have ruined relationships with my family, friends, coworkers, and bosses. Manic episodes result in insomnia, that can last for days. In turn, I get fatigued, cannot focus, feel confused, paranoid, and irate. I cause scenes and hastily leave. So of course, its been difficult maintaining regular employment. I have bipolar, depression and anxiety. This

20. (...continued)
accessed January 7, 2013).

causes fatigue, body aches and headaches. Once fatigued, I am
unable to focus, and even the smallest things upset me. I can
become depressed and can't get out of bed for days. Many times my
bipolar causes me to focus on one thing, and I will focus on that
one thing. If during those times someone attempts to approach me,
I get very angry and annoyed. This always leads to an outburst or
scene of some sort and then I walk out and never come back." Tr.
152.

The record contains several third-party statements from
individuals familiar with Trout's mental condition. The
statements reveal Trout's mood swings and angry, aggressive and
withdrawn behaviors.

On July 23, 2010, Trout's husband, Jeremiah, described
Trout's condition in a two-page typewritten statement. Tr. 216-
217. The statement noted Trout's manic and aggressive behavior as
well as withdrawn behavior. Id. It described instances of
disorderly and assaultive behavior. Id. In concluding the
statement, Mr. Trout noted as follows:

> She has been in fights at Christmas dinners, weddings,
> and even on the way to Church, etc. The stress I go
> through to get through a social event keeps us from
> doing much at all. The few friends are kept at a
> distance. My family relationships have all been
> changed due to this disease. My work has been affected
> because on a daily basis I am dealing with either her
> frustration or over the top behavior. It is tough to
> leave for work when you do not know for sure how she
> is going to do. The disease or disability, whatever

22

you want to call it, is impossible for me to understand.

Tr. 217. Trout's mother, Constance Fownfelter Brooks, submitted a one-page typewritten letter dated July 23, 2010, which states in part as follows:

> Destiny creates so many issues with interactions with people it makes it very difficult for her to function normally outside a controlled environment. You have to walk on egg shells when you are around her because you never know what kind of day she is having. I see her in a pattern or cycle of behavior where she is at her worst she [] stays in her room and does not interact with whomever will be around. At her best it is still a living hell around her. I see my son, her husband, shielding the kids from her outbursts and unstable behavior . . . I do not see how she will ever be able to get or maintain a job with her emotional outbursts and unstable behavior.

Tr. 215. Lisa Fontaine, a friend who knew Trout for three years, in a letter dated July 25, 2010, described Trout's difficulties in relevant part as follows:

> She has frequent panic attacks that I can best describe as causing her to physically and mentally shut down or become frozen. These panic attacks also result in periods of crying and shutting herself off from everyone. Destiny seems to be sad and negative quite often, and she doesn't even like to leave the house anymore. She has socially alienated herself because she says she feels embarrassed and paranoid in public. ... The anticipation of any type of social event puts her in such a state of distress and panic that she often becomes belligerent with those around her. . . . I've also noticed that she often forgets simple things, unknowingly repeating herself and asking me the same things over and over again. . . She does her best to simplify her life and keep to a basic daily schedule, but any added activity or change can instantly throw her into a state of panic or anger.

Tr. 220-221. Trout's young son wrote the following statement: "I see mommy cry and stay in bed almost everyday. I try to help mommy clean [because] I don't like to see her in pain. I give her hugs and kisses [because] I [love] her and I don't like to see her cry." Tr. 218-219.

## Discussion

The administrative law judge, at step one of the sequential evaluation process, found that Trout had not engaged in substantial gainful work activity from her alleged onset date of July 30, 2006, through her date last insured of June 30, 2010. Tr. 16.

At step two, the administrative law judge found that Trout suffers from the following severe impairments: "Bipolar Disorder; Depressive Disorder [not otherwise specified]; Anxiety Disorder [not otherwise specified]; and Fibromyalgia." Tr. 16. The administrative law judge did not make a determination as to whether Trout suffered from panic disorder with agoraphobia, an explosive temper disorder or posttraumatic stress disorder.

At step three of the sequential evaluation process, the administrative law judge found that Trout's impairments did not individually or in combination meet or equal a listed impairment. Tr. 16-19. However, as part of the step three analysis, the administrative law judge found that Trout had "marked

24

difficulties"[21] in social functioning. Tr. 17. In fact, the ALJ found that Trout would have "marked difficulty interacting appropriately with supervisors, coworkers, or members of the public secondary to her mental health impairments." Id. The ALJ further found that Trout would have moderate difficulties with concentration, persistence and pace. Id.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Trout could not perform her past semi-skilled, sedentary to light work as a customer service representative but that she could perform a limited range of sedentary work. Tr. 19-24. Specifically, the administrative law judge found that Trout could perform sedentary work as defined in the regulations

> with the following additional non-exertional limitations: must be able to alternate positions, such as sitting or standing, at her option; limited to low stress occupations, defined as work involving no production quotas, that can be performed by someone who could maintain concentration and attention for ninety percent of the day, and that involves no more than

---

21. The Court is aware of only one definition of "marked" adopted formally as a regulation by the Social Security Administration and incorporated into the Code of Federal Regulations. That definition is as follows: "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(c).

> occasional interaction with the public, coworkers, and supervisors.

Id. In arriving at this residual functional capacity, the administrative law judge found that Trout's statements about her functional limitations were not credible. Tr. 22. The ALJ also rejected the assessment of Dr. Moola, the treating psychiatrist. Tr. 23. Oddly, however, the ALJ placed significant weight on the assessment of Dr. Brink and limited weight on Dr. Santilli's assessment. Id.

At step five, the administrative law judge, based on the above residual functional capacity and the testimony of a vocational expert, found that Trout had the ability to perform unskilled, sedentary work as a surveillance system monitor, bonder in the electronics industry, and a napper tender in the textile industry, and that there were a significant number of such jobs in the local, state and national economies. Tr. 25.

The ALJ also rejected the statements from Trout's friend and family members in part because of the motivation of those individuals to help Trout win her case.[22] Tr. 24.

The administrative record in this case is 451 pages in length, consisting, inter alia, of vocational and medical records.

_____

22. These individuals did not testify at the administrative hearing. Consequently, the ALJ could not make an assessment of their credibility based on their demeanor or manner of testifying.

The Court has thoroughly reviewed that record. Trout argues, *inter alia*, that the administrative law judge erred (1) when formulating Trout's residual functional capacity, and (2) by failing to acknowledge and evaluate all of Trout's medical impairments. Those arguments have substantial merit.

In formulating Trout's residual functional capacity and the hypothetical question for the vocational expert, the administrative law judge described Trout's limitations in social functioning as "no more than occasional interaction with the public, coworkers, and supervisors." This is inconsistent with the administrative law judge's decision that Trout had "marked difficulties" in social functioning, i.e., relating to other people. The record contains only two explicit definitions of "marked." The first definition is from the form completed by Dr. Moola on April 6, 2009, and states as follows: "There is serious limitation in this area. The ability to function is severely limited but not precluded." Tr. 257. The second definition is from the forms completed by Dr. Moola on May 11 and July 23, 2010, and states as follows: "Unable to function independently, appropriately, effectively, and on a sustained basis." Tr. 391 and 393. The Court is unable to see how Trout, under those definitions, could interact on an occasional basis (up to 1/3 of an 8-hour workday, five days per week) with supervisors, co-

workers and the general public. Moreover, if the Court considers the definition of "markedly limited" set forth in the POMS, the answer is clearly that Trout could not do so. That definition – "evidence supports the conclusion that the individual cannot usefully perform or sustain the activity" – would preclude any ability to interact with supervisors, co-workers or the general public.

The administrative law judge also found that Trout could maintain concentration and attention for 90 percent of the day but even Dr. Santilla found that Trout had moderate limitations in concentration persistence and pace. Two documents in the record explicity define "moderate" as "[h]as limitations often." Tr. 391 and 393. "Often" is defined by Merriam-Webster dictionary online as "many times: frequently." Merriam-Webster, http://www.merriam-webster.com/dictionary/often (Last accessed January 7, 2013). It is inconceivable how a person having concentration, persistence and pace problems "often" translates into that person having the ability to maintain concentration and attention for 90 percent of an 8-hour workday.[23] Moreover, the ALJ, while addressing concentration and persistence, did not address any deficit Trout

23. Other than the definition of "moderately limited" set forth in the POMS which was effective on October 14, 2010, the Court is unaware of a definition of that term set forth in 20 C.F.R. pt 404 relating to disability insurance benefits.

28

had with respect to pace.  An ALJ commits error where he omits the limitation relating to pace.  Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004); O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010); Little v. Astrue, Civil No. 10-1626 (M.D. Pa. Sept. 14, 2011) (Kosik, J.).  Also, of significance is the fact that when the vocational expert was presented with Dr. Brink's assessments which included in the body of the form the definitions of "marked" and "moderate," the vocational expert testified that Trout could not perform any competitive employment.[24]  Tr. 59-61.

The Court will now address Trout's second argument.  The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then, when setting a claimant's residual functional capacity, considering the symptoms of both medically determinable severe and non-severe impairments.  20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test.  20 C.F.R. § 404.1520(c).  If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation

24.  The record is at least ambiguous as to the vocational expert's opinion.

29

process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity.  The social security regulations mandate such consideration and this Court has repeatedly so indicated.  See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D. Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D. Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 416.923 and 416.945(a)(2).

The record indicates that, in addition to the mental impairments found by the ALJ, Trout was diagnosed as suffering from panic disorder with agoraphobia, an explosive temper disorder and PTSD.  The failure of the administrative law judge to find those conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Trout as well as the ALJ's assessment of the third-party statements. The administrative law judge found that Trout's medically determinable impairments could reasonably cause Trout's alleged symptoms but that Trout's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Trout's medically determinable impairments. The error at step two is a sufficient basis to remand this case to the Commissioner for further proceedings.

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be vacated and the case will be remanded to the Commissioner for further proceedings.

An appropriate order will be entered.

_____
**United States District Judge**

Date: January 10, 2013